IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____

JAMES ARTHUR CULBRETH, #214 203     *

    Plaintiff,     *

      v.     * CIVIL ACTION NO. 2:02-CV-1220-F

D.T. MARSHALL, *et al*.,     *

    Defendants.     *
_____

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Plaintiff, James Culbreth ("Culbreth"), asserts federal constitutional claims arising out of his detention at the Montgomery County Detention Facility ("MCDF"). He entered MCDF on April 4, 2000 and was released to the custody of the Alabama Department of Corrections on January 12, 2001.[1] In this 42 U.S.C. § 1983 action, Culbreth complains that while incarcerated at MCDF (1) he was denied constitutionally adequate exercise, (2) he was locked down for 23 hours a day for a two month period, (3) he was denied due process during a disciplinary hearing; (4) he was attacked by another inmate because Defendants failed to ensure his safety, and (5) he was denied adequate medical care following the inmate assault. Culbreth names as defendants Sheriff D.T. Marshall, Lieutenant Santina Jenkins, Lieutenant

---

[1] Plaintiff entered MCDF charged with four counts of sodomy in the first degree, enticing a child to enter a house, vehicle, *etc*., for immoral purposes, intimidating a witness, and bad checks. (Doc. No. 32, Savage Affidavit.)

Martin Crenshaw, Captain Gina Savage, Lieutenant Lamar Rogers, Sergeant Deloris Jenkins, Officer Pugh, Officer Allean Hopkins, Officer Angela Carroll, Sergeant Elaine Youngblood, Lieutenant Etta Matthews, Officer Tommie Franklin, Officer Hood, Sergeant Hortense Christburg, and Commissioner Michael Haley.

Pursuant to the orders of this court, Defendants filed special reports and supporting evidentiary materials addressing Plaintiff's claims for relief. (Doc. Nos. 17, 18, 32). The court deems it appropriate to treat these documents as motions for summary judgment. Upon consideration of the motions, the evidentiary materials filed in support thereof, and Plaintiff's response thereto (Doc. No. 34), the court concludes that Defendants' motions for summary judgment should be granted.

## II. STANDARD OF REVIEW

In order to survive Defendants' properly supported motions for summary judgment, Plaintiff is required to produce some evidence supporting his constitutional claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Specifically, he must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. A plaintiff's conclusory, unsupported and self-serving allegations do not provide sufficient evidence to oppose a motion for summary judgment. *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

At the summary judgment stage, the court's role is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In so doing, the court

must view the evidence in the light most favorable to the mon-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where the evidentiary materials before the court indicate that there is no genuine issue of material fact and that a party moving for summary judgment is entitled to such judgment as a matter of law, the entry of summary judgment is proper. *Celotex Corp.*, 477 U.S. at 322; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987).

### III.   CLAIMS FOR RELIEF

#### *A.  Conditions of Confinement*

Culbreth makes two basic complaints about the conditions under which he was housed while at MCDF. He complains that he was denied due process when he was locked down 23 hours a day for a two month period without being afforded a hearing prior to this restrictive housing assignment. Plaintiff further complains that he did not receive constitutionally adequate exercise while detained at MCDF. (Doc. Nos. 1, 6, 15.)

Confinement conditions of pre-trial detainees are to be evaluated under the Due Process Clause of the Constitution rather than under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see Villarreal v. Woodham,* 113 F.3d 202, 207 (11th Cir. 1997) (recognizing that confinement of pretrial detainees is a "necessary restriction" to ensure their presence in court). "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense, however.... And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or

3

restrictions of detention into 'punishment.'" *Bell,* 441 U.S. at 537. In analyzing confinement conditions about which a pretrial detainee complains, a court must decide whether officials intentionally imposed the restriction for a punitive purpose or whether it is reasonably incidental to a legitimate government objective. *See id.* at 538-39; *Villarreal,* 113 F.3d at 207. "If a restriction is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court may infer that the purpose of the government action is punishment." *Lynch v. Baxley,* 744 F.2d 1452, 1463 (11th Cir.1984). Additionally, this Circuit analyzes pretrial detainee complaints against the totality of confinement conditions to determine if there is a constitutional deficiency. *See Hamm v. DeKalb County,* 774 F.2d 1567, 1575-76 (11th Cir. 1985).

   *1.  The Exercise Claim.*

Plaintiff asserts that the exercise opportunities and facilities at MCDF and/or his ability to engage in exercise while detained at MCDF were virtually non-existent and, therefore, resulted in a denial of his constitutional rights. Culbreth alleges that the outside exercise area at MCDF is very small, it provides no sun exposure, the only exercise available is basketball, and there is no room to walk around.  Consequently, Plaintiff contends that the only real exercise available to him was to stand around the exercise yard for 15 to 30 minutes once a week or once every other week.  (Doc. Nos. 1, 6.)

   The general policy at MCDF during the time of Plaintiff's incarceration was to permit all inmates, regardless of classification, to engage in at least thirty minutes of indoor or outdoor exercise each week.  Defendants represent that, due to facility constraints and the

4

staff to inmate ratio, additional exercise time was not possible. Culbreth, who was on protective custody status while at MCDF, could not exercise with general population inmates. Defendants maintain, however, that protective custody inmates are taken for exercise on an individual basis and receive one hour of out-of-cell time each day. During this time, Culbreth had access to a small day room area where he could implement his own exercise routine. Defendants state that the outdoor exercise facility at MCDF is 48 feet long by 25 feet wide with a wire mesh covering which allows in sunshine and fresh air. There are also two basketball goals at each end of the outdoor area. The indoor recreation area at MCDF is also 48' x 25' and contains two ping pong tables, a punching bag, and medicine balls. (Doc. No. 32, Savage Affidavit.)

Despite Plaintiff's contention that he was essentially denied any opportunity to exercise while incarcerated at MCDF, he does not dispute that as a protective custody inmate he had daily access to a day room area and/or out-of-cell recreation for at least one hour a day where he could implement his own exercise regimen. In fact, two months prior to his transfer from MCDF, Culbreth asserts that he was not, in fact, locked down 23 hours a day, because the isolation unit as a whole was not locked down for this amount of time prior to his being attacked by another inmate on November 8, 2000. It is also clear from Plaintiff's own pleadings that, while he found the outside exercise yard at MCDF personally unsatisfactory, he did occasionally have access to this recreation area as well. (Doc. No. 34.)

While the space and time available to Plaintiff for exercise may not have been optimal, he is not constitutionally entitled to any minimum space requirement. *See Bell*, 441

5

U.S. at 543 n.27. Here, Plaintiff has not shown that he was denied the ability and/or opportunity to exercise daily either indoors or outdoors while at MCDF, nor has he shown that any Defendant prevented him from doing so for a punitive purpose. Further, in deciding whether conditions at a jail are so onerously burdensome as to reach constitutional dimensions, courts must look at the totality of the circumstances, including the extent to which the restrictions adversely affect the mental or physical health of the inmate. *See, e. g., Dorrough v. Hogan*, 563 F.2d 1259, 1263 (5th Cir. 1977). There has been no showing that Plaintiff's mental or physical health was threatened as a result of the fact that he was not provided more space or facilities than that offered by the day room area or outside recreation area. Rather, the evidence before the court reflects that Culbreth had both sufficient space and reasonable opportunity to perform at least a limited range of physical exercise both indoors and outdoors during his pretrial detention at MCDF. The court, therefore, finds that Plaintiff has not met his burden of demonstrating that the conditions about which he complains amounted to punishment.

   *2. The Lockdown Claim.*

   Plaintiff alleges that he was denied due process when he was placed in maximum security upon his entry into MCDF and later when he was housed in isolation. This due process challenge arises out of Culbreth's contention that he was not afforded a hearing prior to his placement on lockdown status or isolation. In order for Plaintiff to prevail on his claim that his assignment to maximum security lockdown, protective custody, and/or isolation while at MCDF constituted punishment, he must show it was not reasonably related to a

legitimate, non-punitive purpose.

In her affidavit, Captain Savage states that when Culbreth was brought to MCDF on April 4, 2000 by Trancor Prisoner Transport Company, jail officials were informed that Plaintiff was considered an escape risk and was uncooperative.[2] As a result he was initially placed in a high risk cell. Ten days later, on April 14, 2000, Plaintiff signed a form asking to be moved to protective custody. This request was honored and Culbreth was moved to the isolation unit and placed in cell 3I. On May 1, 2000, Culbreth was relocated to administrative segregation and placed in cell 4A where he remained on protective custody status. Culbreth was returned to cell 3I on October 4, 2000 pursuant to his own request after the local news ran a story regarding his case. Plaintiff felt he would be safer on 3I as a result of the publicity about the charges against him. Plaintiff remained in this location until his transfer to the Kilby Correctional Facility on January 12, 2001. (Doc. No. 32, Savage Affidavit, Doc. No. 34.)

Here, the court finds that Defendants have proffered a legitimate, non-punitive reason for housing Plaintiff in maximum security lockdown, isolation, and/or on protective custody status during his stay at MCDF. *See Zarnes v. Rhodes*, 64 F.3d 285, 291 & n.5 (7th Cir. 1995) (determining that segregation of detainee without a hearing did not violate due process where it was done for legitimate security reasons, and declining to hold that every placement in administrative segregation of pretrial detainee constitutes punishment); *see also Valentin*

---

[2] The documents before the court reflect that Plaintiff was extradited to MCDF from the Whatcom County Jail located in Bellingham, Washington.

7

*v. Murphy*, 95 F. Supp.2d 99, 102-103 (D.Ct. 2000) (placement of former law enforcement officer on segregation for his own protection not punitive). Additionally, Plaintiff's housing assignments while he was detained at MCDF were, in part, a result of his own requests regardless of the basis for such requests. Based on the foregoing, the court concludes that Plaintiff has failed to demonstrate a violation of his due process rights.

### *B. Failure to Protect Claim*

Culbreth asserts that on November 8, 2000, while he was housed in the isolation unit, he was assaulted by another inmate. He contends that the assault occurred because the isolation unit was not properly supervised. Culbreth also alleges that his placement in cell 3I subjected him to an environment where he was likely to suffer an inmate assault due to his perceived sexual orientation, the nature of the charges against him, and his race (white). Plaintiff maintains that Defendants were aware of this risk. (Doc. Nos. 1, 6.)

On November 8, 2000, while housed in cell 3I, Plaintiff was engaged in a fight with inmate Donnie White. At approximately 12:17 p.m., Officer Carroll, who was picking up lunch trays, heard loud noises coming from cell 3I. She immediately entered the control both and saw Culbreth beating on the glass window with a scrub brush. Plaintiff shouted to Officer Carroll that inmate White had struck him in the face. Defendants Youngblood, Hardin, and Franklin reported to the isolation unit at approximately 12:24 p.m. to investigate the matter. Plaintiff refused medical care at the time and was informed that both he and inmate White would be locked down for fighting and that they would both receive disciplinaries. (Doc. No. 32, Affidavits of Savage, Youngblood, Carroll, Hardin, Franklin,

8

and Matthews.)

In the isolation unit, the institution's policy is to only allow one inmate at a time to be out of his cell. At the time Culbreth was housed on cell 3I, officials had determined that the inmates had learned that by putting small objects such as pieces of paper, cards, dominoes, *etc*. in the door lock, they could keep their cell doors from locking, although the door would give the appearance of being locked on the control panel. Defendants determined that this is what occurred on November 8, 2000, when both Culbreth and inmate White were out of their cells at the same time. (Doc. No. 32, Savage and Carroll Affidavits.)

To prevail in a suit based on an alleged failure to protect, an inmate must show first that the harm he suffered was objectively serious and second that prison officials acted with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Aldridge v. Montgomery*, 753 F.2d 970, 972 (11th Cir. 1985). Deliberate indifference in the context of a failure to protect claim means that a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. Unless a prison official actually makes this inference, he does not act with deliberate indifference even where his actions violate prison regulations or can be described as stupid or lazy. *Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997); *see also Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety."); *Marsh v. Arn*, 937 F.2d 1056, 1061 (6th

Cir. 1991).

Culbreth appears to maintain that he has established that prison personnel acted with deliberate indifference to a serious threat to his safety. The court disagrees. As noted, a prison official is deliberately indifferent when he possesses actual, subjective knowledge of an excessive risk of harm to the prisoner's safety and disregards it. *Farmer*, 511 U.S. at 837-39. Culbreth contends that Defendants purposely placed him in cell 3I to be attacked because he was white, because of his perceived sexual orientation, and because of the nature of the charges against him. Plaintiff further asserts that the isolation unit was not adequately supervised and the inmates were allowed to roam around the unit rather than being locked in their cells. Plaintiff does not, however, contend that Defendants and/or any other prison personnel were objectively aware of any potential risk to him arising from violence at the hands of inmate White or any other inmate.

While a prison official may be held liable under the Constitution for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces a substantial risk of serious harm and, by failing to take reasonable measures to abate it, disregards that risk, Plaintiff has failed to show that Defendants knew or should have known that he was going to be attacked by inmate White.

Plaintiff disputes Defendants' contention that inmates housed on the isolation unit were only allowed out of their cells one inmate at time. Specifically, he alleges that prior to November 8, 2000, isolation unit inmates were allowed out of their cells together on a daily basis with no supervision. As it must, the court takes as true Plaintiff's contention that prior

10

to November 8, 2000, inmates housed in the isolation unit were allowed to mingle together outside of their cells. Based on the evidentiary submissions before the court, however, there is no indication that Culbreth had any concerns with this practice nor with the inmates with whom he was housed and/or that he conveyed any such worries to prison officials. There is simply no evidence before the court that Plaintiff believed he was in danger by being housed in the isolation unit or that he ever notified the jailers that he had concerns for his safety or believed that he would be attacked by another inmate.  Further, Plaintiff's contention that Defendants deliberately placed him in an environment where he was likely to be assaulted due to his race, sexual orientation, and the nature of the charges against him is unsupported, conclusory, and based on no more than mere speculation and his own self-serving allegations. Based on the foregoing, the court concludes that the motion for summary judgment with respect to the claim that Defendants acted with deliberate indifference to Plaintiff's safety should be granted.

### C. The Medical Claim

Culbreth alleges that Defendants failed to provide him with medical treatment immediately after he was assaulted by inmate White and thereafter delayed medical care and pain medication.

Defendants maintain that Plaintiff refused medical attention immediately after the incident with inmate White. The altercation between the two inmates occurred at 12:17 p.m. At approximately 5:30 p.m., during evening pill call, Culbreth complained of pain and asked to see a doctor. Prison personnel observed bruises and scratches on Plaintiff's right cheek

11

and temple area. Plaintiff also complained of blurred vision and neck and right ankle pain. He was transported to Baptist Hospital at approximately 6:30 p.m. for x-rays. Culbreth was discharged from the hospital with a prescription for Lortab and Anaprox and was advised to avoid blowing his nose or sneezing. He also received an ace wrap to wear for 3 to 5 days and was directed to follow up with Dr. R.G. Love in 5 to 7 days. (Doc. No. 32, Franklin, Matthews, Savage, and Hardin Affidavits, Medical Records.)

On November 9, 2000 Culbreth received a follow-up examine in MCDF's health care unit. Medical personnel noted that the right side of Plaintiff's face was swollen, the sclera of his right eye was bloodshot, and he had several superficial scratches on his face. Plaintiff requested his pain medication. His medication was ordered November 10, 2000, and medical personnel noted that the medication would be started as soon as possible. (Doc. No. 32, Medical Records.)

Plaintiff had an appointment with Dr. Love on November 14, 2000 which had to be rescheduled due to one of Culbreth's previously scheduled court appearances. Dr. Love subsequently examined Plaintiff on November 22, 2000. The physician found no obvious intraoral injury or dental disruption nor any visible ocular injury. Dr. Love concluded that Culbreth had healed well from his injuries and required no further follow-up. On December 11, 2000 Plaintiff received an ophthalmic evaluation and was prescribed Visine Tears.™ (Doc. No. 32, Savage Affidavit, Medical Records.)

In *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983), the Supreme Court held that the protection afforded a pretrial detainee by the Fourteenth

Amendment is "at least as great" as the protection under the Eighth Amendment granted to a convicted prisoner. Therefore, at a minimum, the deliberate indifference of officials to the serious medical needs of a pretrial detainee will violate the Fourteenth Amendment. *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11th Cir. 1997). In the context of a claim implicating a denial of medical care for a pretrial detainee, this Circuit has treated the Eighth and Fourteenth Amendment protections as co-extensive. *Hamm v. DeKalb County*, 774 F.2d at 1574; *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1396 (11th Cir.1994). Thus, in order for Plaintiff to prevail on his allegation that Defendants failed to provide adequate medical treatment, he must show that they acted with deliberate indifference to his serious medical condition. *See Thornton v. City of Montgomery*, 78 F. Supp. 1218, 1225 (M.D. Ala. 1999), *aff'd*, 228 F.3d 414, 415 (11th Cir. 2000 ( table).

"Deliberate indifference" requires that the official know of and disregard an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. at 837. The official "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (emphasis added). Deliberate indifference suggests a state of mind more blameworthy than negligence. *Id*. at 835. A "serious medical condition" is an objectively serious medical need, that if left unattended, poses a serious risk of serious harm. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal citations omitted).

Culbreth claims that Defendants were deliberately indifferent to his serious medical needs by failing to provide him with medical attention immediately after his altercation with

13

inmate White and by delaying the dispensing of his prescribed medication. According to Culbreth, the assault by inmate White rendered him unconscious for several minutes. When Sgt. Youngblood and Officers Franklin and Hardin arrived at the isolation unit at 12:24 p.m., Plaintiff asserts that it should have been clear that his condition required immediate medical attention because he had been knocked unconscious and was bleeding from his nose, face, and mouth. Instead, Plaintiff asserts that he was locked down in his cell where he passed out with no way to request medical care. Plaintiff had awakened by evening pill call and was taken to the infirmary per his request. After returning from the hospital around midnight on November 9, 2000, Culbreth requested his prescribed pain medication but was informed that he would have to wait until morning when a nurse came on duty. He asserts, however, that his medication was not ordered until November 10, 2000. (Doc. No. 34.)

     The court has carefully reviewed Plaintiff's medical records and concludes that he has not established that Defendants exhibited deliberate indifference to his serious medical needs. While Culbreth asserts that it should have been obvious that he required medical care at the time the altercation occurred and that prison officials should have taken him to the medical unit for evaluation, he does not refute Defendants' assertion that he refused their repeated offers to take him to the infirmary immediately following the incident with inmate White. When Plaintiff requested medical attention, the evidence before the court reflects that he was promptly escorted to the health care unit. He was subsequently taken to the Baptist Medical Center for further evaluation and received follow-up medical care both at MCDF and by a free world physician. Additionally, any claim that specific medical care and medication have

14

been impermissibly delayed requires an inmate to put verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment. *Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). Here, the court finds that no verifying evidence has been produced which tends to establish any detrimental effect of delay in providing medical care or medication for Plaintiff's injuries.

In light of the foregoing, the court finds that Plaintiff has presented no evidence demonstrating that Defendants in any way disregarded a substantial risk to his health. Therefore, the undersigned concludes that Plaintiff has failed to establish deliberate indifference on the part of Defendants and summary judgment is due to be granted in their favor on this claim.

### D. The Disciplinary Claim

Culbreth complains that he was denied due process during disciplinary proceedings lodged against him for having damaged facility property (breaking a window) and when he was sanctioned with a loss of commissary privileges until he paid for the damage out of his inmate account. Plaintiff asserts that he was not responsible for the damage and did not receive a hearing before money was removed from his inmate account. (Doc. Nos. 1, 6.) In his response to Defendants' dispositive motion, Plaintiff alleges that he received only three hours' advance notice of the disciplinary hearing, that the hearing was held without him, and that he never admitted to breaking a window. (Doc. No. 34.)

At the time of the disciplinary, Nikea Herron was the disciplinary clerk and Defendant Patricia Harris was the grievance clerk. According to Defendant Harris, Ms. Herron resigned

her position on July 27, 2001. Ms. Herron was responsible for issuing the disciplinary notice to Plaintiff on November 15, 2000 which charged him with violations B-7 (fighting), A-3 (using abusive language), and C-20 (damaging facility property in excess of $50.00). She also made the finding that Culbreth was guilty of the charged violations based both on the incident report prepared November 8, 2000, following Plaintiff's altercation with inmate White and Plaintiff's own admission that he was involved in the altercation and broke the glass. It was Ms. Herron who imposed the sanctions that Plaintiff loose three weeks of visitation privileges and lose commissary privileges until the glass was paid for. (Doc. No. 32, Harris Affidavit, Incident Report, and Disciplinary Hearing Attachments dated November 15 & 16, 2000.)

It is clear from the evidentiary material before the court that Ms. Herron was responsible for issuing Plaintiff notice of the disciplinary violation on November 15, 2000, and was the hearing officer during the disciplinary proceeding. Ms. Herron, however, is not a named defendant to this complaint and no other named defendant is implicated in the alleged violation of due process with respect to the disciplinary proceeding at issue or the sanctions imposed.

Where a plaintiff fails to allege facts demonstrating that a particular defendant had any direct involvement with, knowledge of, or responsibility for an alleged deprivation of his civil rights, such a claim is due to be dismissed with regard to such defendant(s) as it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989) (discussing dismissal of frivolous actions which embrace invalid legal conclusions and

16

fanciful factual allegations).  Furthermore, to the extent Plaintiff would seek to hold any supervisory officials liable for damages, liability in a § 1983 action may not be based on the doctrines of *respondeat superior* or vicarious liability. *Monell v. Dep't. of Social Services,* 436 U.S. 658, 691 (1978); *Morales v. New York State Dep't. of Corrections,* 842 F.2d 27, 30 (2nd Cir.1988) (inmate stated no claim against prison superintendent absent allegation of a connection between inmate's injuries and any acts on the part of superintendent).  In order for a supervisory official to be held liable for a subordinate's constitutional tort, the official must either be the "moving force [behind] the constitutional violation" or exhibit "deliberate indifference to the plight of the person deprived."  *See City of Canton v. Harris,* 489 U.S. 378, 389 (1989); *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d at 1192 (plaintiff must show either a supervisor's personal participation in, instigation or adoption of acts comprising the alleged constitutional violation or a causal connection between the supervisor's policies or decisions and the constitutional violation).

Here, the court finds no allegation that any named defendant, whether occupying a supervisory role or some other official capacity, had any knowledge of the conduct complained of concerning the November 15, 2000, disciplinary proceedings. Because § 1983 requires direct involvement and/or some causal connection with respect to the unconstitutional actions, and as the court cannot find a stated cause of action between the alleged due process violations with respect to the November 15, 2000, disciplinary hearing and any of the named defendants, summary judgment is due to be granted in their favor on this issue.

### *E. Commissioner Michael Haley*

Plaintiff names former Commissioner Haley as a defendant. As noted, supervisory liability cannot be imposed under § 1983 on a *respondeat superior* theory. *See Monell,* 436 U.S. 658 (1978); *Rizzo v. Goode,* 423 U.S. 362 (1976). In order for a supervisory official to be held liable for a subordinate's constitutional tort, the official must either be the "moving force [behind] the constitutional violation" or exhibit "deliberate indifference to the plight of the person deprived." *City of Canton,* 489 U.S. at 389.

The Alabama Department of Corrections inspects county jails in accordance with State law but, as a matter of policy, the Department does not review or investigate incidents which occur at county jails. Further, Commissioner Haley has no control over inmate classification and/or housing assignments at MCDF. (*See* Doc. No. 18, Exh. A.)

Here, the court finds that Plaintiff does not raise any specific allegations regarding Defendant Haley. Further, to the extent he implies that this Defendant is liable simply because of his supervisory position, Culbreth has failed to allege that Commissioner Haley had any knowledge of the conduct about which Plaintiff complains much less that he was aware of such a risk and acted with deliberate indifference in failing to address it. *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). In light of the foregoing, Defendant Haley's dispositive motion is due to be granted.

### IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendants' motions for summary judgment (Doc. Nos. 17, 18, 32), be granted;

      2. Judgment be entered in favor of Defendants;

      3. The costs of this proceeding be taxed against Plaintiff; and

      4. This case be dismissed with prejudice.

It is further

ORDERED that the parties shall file any objections to the said Recommendation within a period of 13 days from the date of mailing or transmittal to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

Done on this the 24th day of January, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE